**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 CR 774-3 |
| | ) | Judge John J. Tharp |
| GREGORY CHESTER, *et al.*, | ) | |
| (PARIS POE) | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT POE'S MOTION TO SUPPRESS IDENTIFICATION
RELATED TO MAY 13, 2009 VOICE LINEUP AND IN-COURT IDENTIFICATION**

Defendant, **PARIS POE**, by his attorneys, **PATRICK W. BLEGEN** and **PAUL M.
BRAYMAN**, pursuant to the Due Process Clause of the Fifth Amendment to the Constitution of
the United States, and rules 2 and 12(b)(3)(C) of the Federal Rules of Criminal Procedure, as
well as this Court's inherent supervisory powers, respectfully moves this Court for an order
suppressing any testimony or other evidence related to an auditory line up and subsequent
identification of Defendant Poe taking place on or about May 13, 2009.

In support of this motion, Defendant, through counsel, shows to the Court the following:

1.     Defendant is charged in three counts of a ten-count superseding indictment with
racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); murder in aid of
racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Two); and, obstruction of justice
through murder, in violation of 18 U.S.C. § 1503(a) & (b)(1) (Count Six). If convicted,
Defendant faces a potential punishment of life in prison.

2.       One of the racketeering acts listed in Count One is "[t]he robbery of Victim 6 and Victim 7 by Paris Poe, Gary Chester, and others known and unknown to the Grand Jury on or about March 25, 2009."  R. 169 at p. 12, ¶8(u)(iii).

3.       The robbery of Victims 6 and 7[1] allegedly occurred on March 25, 2009, at a residence on the south side of Chicago.

4.       According to Victims 6 and 7, two offenders forced their way into the victims' home at gunpoint. They allegedly tackled and subdued the victims, then let two additional offenders into the home.  The victims were allegedly burned with an iron, and one was allegedly pistol-whipped as the offenders demanded $100,000 or kilos of cocaine.  After the victims stated they did not have drugs or that kind of money, the offenders then allegedly ransacked the house and stole various items, including a plasma television.

5.       On or about May 13, 2009, Mr. Poe was arrested by members of the Chicago Police Department in connection with the robbery.  He was then transferred to Area 2 Detective Division.

6.       Once at Area 2, members of CPD conducted an "auditory line up."  According to reports tendered during discovery:

> For the safety of the [line up] fillers and officers, Poe was handcuffed during the line-up.  While escorting Poe to the line-up other fillers observed his behavior and refused to participate, R/Det. required the assistance of other officers to conduct the line-up.
>
> At 1820 hours [Redacted][2] was directed into the interview room and faces the opposite wall, while the fillers and Poe were directed to stand with their backs to the glass.  Each filler and Poe were

---

[1] According to photographs tendered in discovery, Victims 6 and 7 are two Hispanic males, one of whom was a minor at the time of the offense.

[2] Though his identity has been redacted, reports suggest it was the minor victim who viewed and/or listened to the lineup.

directed to state ["]Just shoot him in the leg, shoot him in the leg? [sic]. Each filler was directed to read the statement twice, before [Redacted] identified Poe, #3 as one of the persons in his home while the offenders entered his home and tortured him & his brother.[3]

7.      Counsel believes that the government will seek to introduce evidence of this identification by one of the victims.  Counsel further believes that the government will seek to have the victim identify Defendant at trial as one of the individuals involved in the March 25, 2009, robbery.  Because of the unduly suggestive nature of the victim's identification of Defendant Poe, the Court should suppress both the May 13, 2009, identification and any trial identification by the victim.

8.      Criminal defendants have a due process right to be protected from pretrial identification that is "unnecessarily suggestive and conducive to irreparable mistaken identification."  *Stovall v. Denno*, 388 U.S. 293, 301-302 (1967).  To evaluate whether an identification comports with due process, a two-step analysis is used.  First, a defendant must demonstrate that the identification procedure was both suggestive and unnecessary.  *United States v. Sanders*, 708 F.3d 976, 983-84 (7th Cir. 2013), *citing Perry v. New Hampshire*, --- U.S. ---, 132. S.Ct. 716, 724 (2012).  Second, a court must evaluate "whether, under the totality of the circumstances, the identification was reliable despite the suggestive procedures."  *Id.*, *citing Perry*, 132 S.Ct. at 725.  If an identification is both suggestive and unreliable, the identification is inadmissible.  *See*, *Perry*, 132 S.Ct. at 724-25.

9.      With regard to the first step of the identification analysis, there should be no question but that the lineup was unduly suggestive.  Mr. Poe was placed in a line up room with four other people, and Mr. Poe was the only person handcuffed.  Two of the lineup fillers (all of

---

[3] Police reports regarding this incident, including a photograph of the lineup participants, are available at the Court's request.  It does not appear that the voice portion of the lineup was recorded.

whom were CPD officers) were older and dressed differently than the three other participants. While the line-up was allegedly meant to be "auditory" in nature, there is nothing in the police reports that suggest the lineup was not visible to the victim once he entered the lineup room and before he turned to face the "opposite wall." Indeed, even if the participants had "turned their backs to the glass" prior to the victim's entry into the lineup, the victim would likely have been able to tell that two of the participants were dressed differently than the others, and that only one of the participants was handcuffed.

10. Moreover, such a procedure was unnecessary. The victim had not seen the offender during the offense,[4] and was not asked to identify him by sight. Rather, he was asked if he recognized the offender's voice. A physical lineup, then, was pointless.[5] Instead, law enforcement could have recorded Mr. Poe and the others stating, "Just shoot him in the leg, shoot him in the leg,"—the phrase they were asked to say during the lineup—and then played those recordings for the victim. *See*, *United States v. Schultz*, 698 F.2d 365, 367 (8th Cir. 1983).

11. It is likely that the line-up was auditorily suggestive as well. The reports provide no information about the similarities and differences in the participants' voices, and to counsel's knowledge no audio recording was made so that the evidence of the other lineup voices would be preserved. The Illinois statute in effect at the time of the lineup required that "[a]ll lineups shall be photographed or otherwise recorded." 725 ILCS 5/107A-5.[6] In *People v. Faber*, 974 N.E.2d

---

[4] The initial report prepared by police indicates that the victim may have seen two of the allegedly four offenders, but later reports reveal that Mr. Poe was not believed to be one of the offenders the victim saw. A supplemental report states, "an auditory line-up was conducted because victim…did not see any other offenders, but heard them communicating during the crime."

[5] Reports allege that Mr. Poe "became aggressive and argumentative" at Area 2. For this reason, it is alleged, Mr. Poe was handcuffed during the lineup, and detectives were forced to use CPD officers as lineup fillers because the other fillers declined to participate. Even assuming this is true, it does not explain why a lineup was done in the first place considering the victim never saw the offender.

[6] This statute has since been replaced by 725 ILCS 5/107A-2, a comprehensive lineup procedure statute that is clearly designed to make lineups more neutral and less suggestive.

337, 349 (1st Dist. 2012), the Illinois Appellate Court, First District refused to reverse a conviction because the State failed to preserve the photograph of a lineup. The court noted that the defendant confessed to the crime and two other witnesses independently identified him. *Id.* at 349. The court, however, noted its displeasure with the State's failure to preserve the photograph:

> [W]e find the failure of the State to disclose the photo arrays to Faber's counsel as requested very disturbing. We do not hold that there can never be consequences to the State's noncompliance with the statute. . . . We caution that in a case where the evidence is closely balanced, it may be that the correct remedy is to suppress the identification testimony.

12. Here, there is no confession by Mr. Poe, and there are no other eyewitnesses. The voice identification itself is also suspect for the reasons noted above – the opportunity for the witness to even hear the voice was limited (as he was covered by a comforter) and the voice was not described as distinctive in any way. Under these circumstances, the voice identification should also be suppressed because law enforcement failed to record and preserve the voice lineup.

13. For these reasons, counsel submits that the identification of Defendant by the victim was both unduly suggestive and unnecessary, and it therefore meets the first requirement of the analysis.

14. The second step of the identification analysis requires this Court to evaluate whether the identification of Mr. Poe was nevertheless reliable under the circumstances. *United States v. Ford*, 683 F.3d 761, 766 (7th Cir. 2012), *citing Perry*, 132 S.Ct. at 720, *Simmons v. United States*, 390 U.S. 377, 384 (1968). In doing so, the Court should consider the "totality of the circumstances" to determine whether other indicia of reliability "outweigh [ ] ... the corrupting effect of law enforcement suggestion." *Sanders*, 708 F.3d at 983-84, *citing Perry*, 132

S.Ct. at 725.  Factors the Court may consider include: (1) the witness's opportunity to view the suspect at the scene of the crime; (2) the witness's degree of attention at the scene; (3) the accuracy of his pre-identification description of the suspect; (4) the witness's level of certainty in the identification; and, (5) the time elapsed between the crime and the identification.  *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

15.     Without question, this identification should be deemed unreliable and be suppressed.  According to reports, the victim never saw the offender he was attempting to identify.  Rather, he was placed face down under a comforter shortly after the robbery occurred, and remained there until the offenders fled.   And while the victim may have heard the offender's voice (muffled by a comforter), none of the reports describe it as unique or memorable. In fact, the voice is not described at all.  Finally, the lineup was conducted more than a month after the robbery.

16.     Given the delay between the offense and the identification, the apparently unremarkable nature of the offender's voice, and the fact that the victim *never saw* the offender, there is nothing about the identification that supports a finding that it is reliable despite the suggestive circumstances.  Consequently, any evidence related to the lineup or identification should be suppressed.

17.     Counsel believes that the government may also seek to elicit testimony from the victim identifying Mr. Poe at trial as one of the offenders involved in the home invasion, aggravated battery, and robbery.  Where there is no prior suggestive identification, the credibility of an identification at trial is an issue for the jury, and the defense is given the opportunity to test the identification's accuracy on cross examination.  *United States v. Allen*, 930 F.2d 1270 (7th Cir. 1991).  However, in a situation such as this, where the in-court identification will be made

after a previous suggestive identification has been made, "the in-court identification is *inadmissible* unless it is so reliable, in view of the totality of the circumstances, as to prevent a substantial likelihood of misidentification." *United States v. Rutledge*, 40 F.3d 879, 889 (7th Cir. 1994) *rev'd on other grounds*, 517 U.S. 292 (1996) (emphasis added).

18. To determine whether an in court identification is sufficiently reliable after a prior, suggestive identification, the Court may use the same *Biggers* factors listed above. *See id.* at 889. In this situation, the burden is on the government to establish that the "identification was based upon observations of the suspect other than at the prior, illegal identification." *U.S. ex rel. Hudson v. Brierton*, 699 F.2d 917, 925 (7th Cir. 1983), *citing United States v. Wade*, 388 U.S. 218, 240 (1967).

19. Here, the totality of the circumstances, including the *Biggers* factors, supports a finding that the identification of Mr. Poe at the May 13, 2009, lineup was unreliable. The same analysis, therefore, requires a finding that a subsequent in-court identification of Mr. Poe would also be unreliable. It is worth noting, too, that by the time of trial more than *seven years* will have passed since the offense.

20. In light of the above, the defense requests that the Court suppress both the May 13, 2009, identification by the victim as well as any trial identification. In the event that the Court determines that more information is required to resolve these issues, counsel requests that the Court conduct an evidentiary hearing in order to more fully develop the relevant facts and circumstances.

WHEREFORE, based on the foregoing, Defendant Poe respectfully moves this Court for entry of an order suppressing any evidence related to the victim's May 13, 2009, identification of Defendant Poe, and any subsequent identification at trial.

Respectfully submitted,

 s/ Patrick W. Blegen
**PATRICK W. BLEGEN**, One of the
Attorneys for Defendant Paris Poe.

**BLEGEN & GARVEY**
53 West Jackson Boulevard, Suite 1437
Chicago, Illinois 60604
(312) 957-0100