IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GREGORY CHESTER, *et al.*, )<br>(PARIS POE) )<br>)<br>Defendant. ) | No. 13 CR 774-3<br>Judge John J. Tharp |

**DEFENDANTS' JOINT MOTION TO EXCLUDE
EXPERT TESTIMONY REGARDING FIREARM TOOLMARK ANALYSIS**

Defendant **PARIS POE**, by his attorneys, **PATRICK W. BLEGEN** and **PAUL M. BRAYMAN**, and also on behalf of codefendants **GREGORY CHESTER**, **ARNOLD COUNCIL, GABRIEL BUSH, STANLEY VAUGHN, WILLIAM FORD** and **DERRICK VAUGHN**, pursuant to Fed. R. Evid. 702, *Daubert v. Merrell Dow*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), moves this Court to enter an order excluding any expert testimony regarding firearm toolmark analysis; or, in the alternative, to conduct an evidentiary hearing.

In support thereof, Defendant, through counsel, shows to the Court the following:

**I.     Introduction**

Defendant is charged in three counts of a ten-count superseding indictment with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Two); and obstruction of justice through murder, in violation of 18 U.S.C. § 1503(a) & (b)(1) (Count Six). If convicted, Defendant faces a potential punishment of life in prison.

The government has alleged that the defendants were members of a criminal enterprise known as the "Hobos" and engaged in a number of violent acts, including murders, attempted murders, batteries, and armed robberies - several of which involved firearms. As part of discovery, the government has tendered numerous Illinois State Police and FBI lab reports which purport to identify and analyze bullets, cartridge cases, and fragments found at the scenes of various shootings. At least some of these reports conclude that certain bullets, cartridge casings, and fragments were fired from the same gun because they bear similar markings.

Though expert disclosures have not yet been made, counsel believes that the government intends to call an expert witness to testify to these findings. In order to provide the Court and parties with sufficient time to resolve this matter prior to trial, Defendant now asks that this testimony be excluded because it is not sufficiently reliable. Defendant would reserve the right to supplement this motion after receiving the government's expert disclosure.

**II.    Rule 702, *Daubert*, and *Kumho***

Rule 702 of the Federal Rules of Evidence, which governs expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, the district court functions as a "gatekeeper" and must evaluate the admissibility of proffered expert testimony. *United States v. Glynn*, 578 F. Supp 2d 568, 570-71 (S.D.N.Y. Sept. 22, 2008)(Rakoff, J.). The current version of the rule reflects the Supreme Court's holdings in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1993). In *Daubert*, the Court, concerned with the

undue influence so-called expert testimony may have over a jury, established a flexible, factor-based approach to determine the reliability of such testimony. 509 U.S. at 593-94; *see also United States v. Diaz*, 2007 WL 485967 at *4 (N.D. Cal. Feb. 12, 2007) (Alsup, J.). These factors may include: (1) whether a method can or has been tested; (2) the known or potential rate of error; (3) whether the methods have been subject to peer review; (4) whether there are standards controlling the technique's operation; and, (5) the general acceptance of the method within the relevant community. *Daubert*, 509 U.S. at 593-94.

Expert testimony includes not just scientific testimony, but rather all testimony based on specialized knowledge. *Kumho*, 526 U.S. at 147; *see also United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002). In analyzing proffered expert testimony, the Court is free to deviate from the factors listed in *Daubert* and "fashion an approach more precisely tailored to an evaluation of the particular evidentiary submission" at hand. *Conn*, 297 F.3d 556. The fundamental task nevertheless remains the same: to ensure relevance and reliability. *Kumho,* 526 U.S. at 151-52*.*

**III.    The Standard Methodology of Firearms Identification is Unreliable**

The principle underlying firearms identification is that "no two firearms should produce the same microscopic features on bullets and cartridge cases such that they could be falsely identified as having been fired by the same firearm." *United States v. Monteiro*, 407 F. Supp. 2d 351, 361 (D. Mass. Jan. 6, 2006), *citing* Erich D. Smith, *Cartridge Case and Bullet Comparison Validation Study with Firearms Submitted in Casework*, 36 AFTE J. 130 (2004); *see also* Sally A. Schehl, *Firemark Tools in the FBI Laboratory: Part One*, Forensic Science Communications (April 2000), available: https://www.fbi.gov/about-us/lab/forensic-sciencecommunications/fsc/april2000/schehl2.htm/schehl1.htm#FirearmsID. These marks, known as "toolmarks," stem from the manufacturing process. Proponents of firearms

identification contend that the "'process of cutting, drilling, grinding, hand-filing, and, very occasionally, hand polishing…will leave individual characteristics'" on every firearm. *Monteiro*, 407 F. Supp 2d at 359, *citing* Brian J. Heard, *Handbook of Firearms and Ballistics* 127 (1997). Thus, they contend, that when a shot is fired from that firearm, "the various components of the ammunition come into contact with the firearm at very high pressures. As a result, the individual markings on the firearm parts are transferred to the ammunition." *Id.* at 359-60.

For example, "the expansion of the fired cartridge and the high pressures propelling the bullet through the bore of the barrel press and scrape the bullet against the rifling as it heads toward the muzzle. The fired bullet, as a result, will bear the negative impressions of the grooves in a rifled barrel." *See* Schehl, *supra*. The cartridge case, on the other hand, is "slammed into the standing breech face," where "'some of the individual toolmarks left on the breech face…are replicated on the surface of the cartridge case.'" *Monteiro*, 407 F. Supp. 2d at 360, *citing* Heard, *supra,* at 131. Additional marks may be left on the ammunition "when parts of the firearm, like the firing pin, the extractor, or the ejector, are moved across the cartridge case." *Id.*, *citing Theory of Identification*, Association of Firearm and Toolmark Examiners ("AFTE"), 30 AFTE J. 86, 88 (1998).

  a. *Class, Sub-Class, and Individual Characteristics*

Examiners classify toolmarks in three categories: class, subclass, and individual characteristics. *Id*, *citing* AFTE *Theory of Identification,* at 87-88. The goal of toolmark examination "is to distinguish between class and sub-class characteristics on one hand, and individual characteristics on the other, which ostensibly apply to the particular gun in question." *United States v. Green*, 405 F. Supp. 2d 104, 110-11 (D. Mass., Dec. 20, 2005)(Gertner, J.). Class characteristics are defined as "family resemblances" which are present in all firearms of

4

the same make and model. *Monteiro*, 407 F. Supp. 2d at 360. Class characteristics "potentially reproduce similar marks on all ammunition fired from a particular make and model of a firearm." *Id*. Subclass characteristics, in contrast, "are produced incidental to manufacture" and "can arise from a source which changes over time." *Id*., *citing* AFTE *Theory of Identification*, *supra,* at 88. Thus, subclass characteristics may only be present on a subset of guns of the same make and model, "such as those manufactured at a particular time and place." *Id*. Finally, individual characteristics are "[r]andom imperfections produced during manufacture or caused by accidental damage," which, according to proponents of firearms identification, "are unique to that object and distinguish it from all others. *Id*, *citing* Heard, *supra*, at 132.

      b.      "*Real World*" *Weaknesses*

There are a number of pitfalls associated with the theory of firearms identification. Initially, the belief that the markings on ammunition fired from the same firearm will be a perfect match is not rooted in reality. *Id*. at 362; *see also Green*, 405 F. Supp 2d at 111. Indeed, "in the real world, there is no such thing as a perfect match." *Id*., *citing* Alfred A. Biasotti, *A Statistical Study of the Individual Characteristics of Fired Bullets*, 4 J. Forensic Sci. 34, 44 (1959). Biasotti's 1957 study found that only 21-38% of marks will match up on bullets fired by the same gun, while 15-20% of marks will match up on bullets fired by different guns of the same make and model. *Id*, *citing* Biasotti, *supra*, at 37-40, 90. The same is true of cartridge cases. As the *Green* court found,

> Even if the marks on all the casings are the *same*, this does not necessarily mean they came from the *same gun*. Similar marks could reflect class or sub-class characteristics, which would define large numbers of guns manufactured by a given company. Just because the marks on the casings are *different* does not mean they came from *different guns*. Repeated firings from the same weapon, particularly over a long period of time, could produce different marks as a result of wear or simply by accident.

5

*Green*, 405 F. Supp. 2d at 107 (emphasis in the original).

Significantly, a 2008 report authored by the National Research Council Committee to Assess the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database ("NRC Report") casts severe doubt on the theory underlying firearms identification. The NRC Report determined:

> Additional general research on the uniqueness and reproducibility of firearm-related toolmarks would have to be done if the basic premises of firearms identification are to be put on a more solid scientific footing
> …
>
> Fully assessing the assumptions underlying firearms identification would require careful attention to statistical experimental design issues, as well as intensive work on the underlying physics, engineering, and metallurgy of firearms.

Committee to Assess the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database, National Research Council, *Ballistics Imaging* (National Academies Press 2008, available at http://books.nap.edu/catalog/12162.html) ("NRC Report") at 82. The NRC report concluded that "the validity of the fundamental assumptions of uniqueness and reproducibility of firearm-related toolmarks has not been fully demonstrated." *Id*. at 3, 8.

Other complications abound as well. For instance, a particular firearm's markings will change over time; "marks present at one period may not be there at another," which may impact the reliability of "matches" of ammunition fired years apart. Moreover, firearms do not wear uniformly; rather, this is generally dependent on the kind of gun in question and the material of which it is composed. For example, "[a] Hi Point is one of the cheapest guns made. It is not a particularly high quality gun, in part because it is made with softer steel (10/10 steel) than other

6

firearms. Because it is soft, it is more susceptible to wear over time than the steel in other firearms." *Green*, 405 F. Supp. 2d at 112.

Additionally, two-dimensional analysis, used by many firearms examiners, can be misleading. *Id*. at 111. While a "pattern may look like a class characteristic, the particular depth of the line examined could be an individual one." *Id*. Even when two-dimensional analysis is not used, distinguishing between class, subclass, and individual characteristics is difficult. *Monteiro*, 407 F. Supp 2d at 363. Thus, there is a real danger of confusing categories of characteristics, resulting in erroneous analyses. *Id.* Finally, fired ammunition is rarely in a condition to permit perfect comparison. "The bullets and/or shell casings recovered from the crime scene may be damaged, fragmented, crushed, or otherwise distorted in ways that create new markings or distort existing ones." *United States v. Glynn*, 578 F. Supp. 2d 567, 573 (S.D.N.Y., Sept. 22, 2008)(Rakoff, J.); *see also Green*, 405 F. Supp. 2d at 110 ("[E]ven assuming that some of these marks are unique to the gun in question, the issue is their significance, how the examiner can distinguish one from another, which to discount and which to focus on, how he is qualified to do so, and how reliable his examination is.")

    c.    *Lack of Objective Standard*

Further complicating the analysis is the fact that there are no objective, quantitative standards for determining whether two ammunition components match. *Id*. S*ee also Glynn*, 578 F. Supp. 2d at 570-71; *Green*, 405 F. Supp. 2d at 114. The conclusion that two bullets or cartridge cases "match" one another "is based on a subjective 'threshold…held in the mind's eye of the examiner and…based largely on training and experience in observing the difference between known matching and known non-matching toolmarks.'" *Monteiro*, 407 F. Supp. 2d at 362-63, *citing* Richard Grzybowski et al., *Firearm/Toolmark Identification: Passing the*

7

*Reliability Test Under Federal and State Evidentiary Standards*, 35 AFTE J. 209, 213 (2003). There is "no application of probability studies and statistics to the field of firearm identification." *Id*. at 363.

In recent years, firearms examiners have rested on the notion of "sufficient agreement," which ATFE defines as follows:

> This "sufficient agreement" is related to the significant duplication of the random toolmarks as evidenced by the correspondence of a pattern or combination of patterns of surface contours. Significance is determined by the comparative examination of two or more sets of surface contour patterns comprised of individual peaks, ridges, and furrows. Specifically, the relative height or depth, width, curvature and spatial relationship of the individual peaks, ridges and furrows within one set of surface contours are defined and compared to the corresponding features in the second set of surface contours. Agreement is significant when it exceeds the best agreement demonstrated between the toolmarks known to have been produced by different tools and is consistent with agreement demonstrated by toolmarks known to have been produced by the same tool. The statement that "sufficient agreement" exists between two toolmarks means that the likelihood that another tool could have made the mark is so remote as to be considered a practical impossibility.

*Id*. at 363, *citing* AFTE *Theory of Identification*, *supra,* at 86.

Disturbingly, the concept of "sufficient agreement" depends almost entirely on the specific examiner's knowledge of class and subclass characteristics of hundreds, if not thousands, of individual firearms. The concept is not based on "any quantitative standard for how many striations or marks need to match or line up. Instead, it is based on a holistic assessment of what the examiner sees," and complicated by the "real world" hazards described above. *Id*. at 364, *citing* Grzybowski et al., *supra*, at 214. As *Green* notes, this "methodology is of particular concern in distinguishing sub-class characteristics from individual characteristics. The first time an examiner observes a particular sub-class characteristic, he may assume it is an individual

8

characteristic." *Green*, 405 F. Supp. 2d at 112 n. 14. For this reason, many Courts have concluded that "whatever else ballistics identification analysis [can] be called, it [can]not be fairly called 'science.'" *Glynn*, 578 F. Supp. 2d at 570; *see also Monteiro*, 407 F. Supp. 2d at 365 ("Firearm identification evidence straddles the line between testimony based on science and experience.").

### IV. Case Specific Issues

In addition to the general reliability issues discussed above, this case presents a number of unique challenges to firearms identification.

    *a.*    *"Matches" in the absence of firearms*

Based on discovery tendered to date, it appears that the majority of ballistics "matching" in this case was done in the absence of known source samples. In other words, the FBI and ISP labs have concluded that cartridge cases and bullets found at one crime scene have been fired from the same firearm as cases and bullets found at others, without actually recovering or test firing those firearms.

This may produce results of questionable reliability. "The most reliable way to assess the potential for subclass influences in a toolmark is by direct examination of the responsible tool working surface that produced the mark." Alfred Biasotti, John Murdock & Bruce Moran, *Scientific Issues*, in 4 David L. Faigman, et al., *Modern Scientific Evidence*, 553 n. 2 (2006-2007). Thus, it is particularly difficult to make accurate identifications in the absence of the firearm. And, it is made even more difficult by the great number of makes and models of firearms (each with their own potential for subclass characteristics) available. Indeed, by 2009, it was estimated there were 310 million firearms available to civilians in the United States.

9

William K. Krouse, Congressional Research Service, *Gun Control Legislation*, 13 (November 14, 2012) available at: https://fas.org/sgp/crs/misc/RL32842.pdf.

      b.     *Suggestive Testing*

Moreover, most of the ballistic "matches" at issue in this case were made after law enforcement instructed ISP to compare specific bullets or cases against other specific bullets or cases to see if they matched. Testing, therefore, was not blind. At least one court has likened a procedure similar to this one to a show up, as opposed to a lineup. *Green*, 405 F. Supp. 2d at 115-16. Thus, the suggestive nature of the comparisons casts doubt on the reliability of the results.

      c.     *IBIS*

It appears that firearms examiners used the Integratable Ballistic Identification System ("IBIS") in determining at least some of the ballistics "matches" the government intends to introduce into evidence. IBIS is "[a] national computer database" which "uses a laser measuring device to evaluate shell casings and provides the examiner with a list of possible matches." *Id*. at 116. IBIS has been "widely criticized," as [i]ts efficacy is limited by the detail with which police departments have scanned old shell casings into the computer and the accuracy of mathematical algorithms used to compare casings." *Id*.

**V.**    **Case Law**

The defense concedes that there are a number of cases from other circuits indicating that expert toolmark identification is regularly admitted. See, e.g., *United States v. Johnson*, 2015 WL 5012949 (N.D. Cal. 2015) (collecting cases); *United States v. Diaz*, 2007 WL 485967 (N.D. Cal. 2007) (collecting cases). The issue appears to be one of first impression in the Seventh Circuit, however, as counsel's research has not uncovered any Seventh Circuit case addressing

10

the admissibility of firearm toolmark expert testimony. In light of the absence of direction from the Seventh Circuit, as well as criticism of toolmark testimony in recent years, this Court should preclude such evidence; or, at the very least, conduct an evidentiary hearing. *See*, Committee to Assess the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database, National Research Council, *Ballistics Imaging* (National Academies Press 2008, available at http://books.nap.edu/catalog/12162.html); Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 Colum. Sci. & Tech. L.Rev. 2 (2005).

## V. Conclusion

For all of the foregoing reasons, Defendant Poe submits that firearm toolmark analysis is unreliable and inadmissible. Defendants respectfully request that this Court enter its order excluding firearm toolmark analysis from introduction into evidence pursuant to Fed. R. Evid. 702, *Daubert*, and *Kumho*, or, in the alternative, conduct an evidentiary hearing on the matter.

Respectfully submitted,

 s/ Patrick W. Blegen
**PATRICK W. BLEGEN**, One of the
Attorneys for Defendant Paris Poe.

**BLEGEN & GARVEY**
53 West Jackson Boulevard, Suite 1437
Chicago, Illinois 60604
(312) 957-0100